### Western Electric Company v. Barbara Prochaska.

#### Gen. No. 12,762.

1. ASSUMED RISK—*when question as to effect of promise to repair for jury.* Where the promise to repair was made to the servant, but it is contended that it was made simply for the purpose of improving the efficiency of the machinery and not for the purpose of removing a danger caused by its condition, it is for the jury to determine the effect of the promise and whether it justified the servant's continuing at his employment.

2. SERVANT—*under no obligation to make inspection.* A servant is under no obligation to inspect machinery for the purpose of ascertaining latent defects.

3. EXPERIMENTS—*when incompetent.* Experiments or evidence of the result of experiments is incompetent, unless it is shown that the article experimented with was identical with that in question in the case.

4. MEDICAL EXPERT—*what evidence by, incompetent.* Where the evidence is that one eye was injured but that the other was not and that no inflammation had arisen after such accident and prior to the trial, which was about three years after the accident, it is not competent for a medical expert to testify as to what would be the effect of inflammation arising in the uninjured eye.

VOL. 129.]        Western Electric Co. v. Prochaska.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Reversed and remanded. Opinion filed November 23, 1906.

**Statement by the Court.** This is an appeal by the defendant from a judgment recovered against it by appellee in an action for personal injuries.

Plaintiff was employed by the defendant to operate a machine used to wind fine insulated wire upon small spools. The machine consisted of two uprights which supported and carried a horizontal shaft or spindle less than half an inch in diameter. One end of the spindle extended beyond the upright and at its outer end fitted into a small metal chuck from which projected a screw. To wind a spool, plaintiff by means of the projecting screw fastened the spool to the spindle; fastened an end of the wire to the spool; turned on the power, which caused the spindle to revolve rapidly and as the spool revolved, so handled and guided the wire that it was properly wound upon the spool.

On the day of the accident the projecting screw was bent and plaintiff took the chuck from the spindle, carried it to the foreman of her department and asked him for another chuck. The foreman with a pair of pinchers straightened the screw, handed it back to the plaintiff, saying: "There, that will do. After a while I will give you another chuck." Plaintiff put the chuck back upon the spindle, resumed her work and fifteen minutes afterwards the screw broke close to the chuck and the spool flew and struck plaintiff in the eye, inflicting the injuries complained of.

The cause was submitted to the jury upon the fifth and sixth additional counts. The breach of duty set up in each of these counts, is the failure of the defendant to use reasonable care to furnish the plaintiff with a machine which was reasonably safe for her to work upon, and the fifth count also set up, as affect-

ing the question of assumption of risk, the complaint of plaintiff to her foreman of the bent screw, the promise to repair and the failure to do so.

The jury found the defendant guilty and assessed plaintiff's damages at $10,000.

The court compelled the plaintiff, to avoid a new trial, to remit $4,000, and from a judgment for $6,000, the defendant prosecutes this appeal.

HOLT, WHEELER & SIDLEY, for appellant.

O. L. KOLAR and E. M. BUMPHREY, for appellee; A. B. FLEAGER, of counsel.

MR. JUSTICE BAKER delivered the opinion of the court.

It is contended by appellant that the court should have directed a verdict for the defendant because, although the plaintiff complained of the bent screw to her foreman and he after straightening it gave the chuck in which it was back to her, told her to use it for the present and promised to give her a new chuck, still she assumed the risk, because, for all that appears, plaintiff made such complaint, not because she feared danger to herself from the use of the bent screw, but because, with such bent screw, the spool would not run true and it was more difficult for her to properly wind wire upon a spool, and because it does not also appear that there was in the mind of the foreman any thought of danger to the plaintiff in the use of the straightened screw, or that the promise to furnish another screw was made with a view of removing such danger. In support of this contention the following cases are cited: Tesmer v. Boehm, 58 Ill. App. 609; Chicago Bridge & Iron Co. v. Hayes, 91 Ill. App. 269; Equitable Powder Mfg. Co. v. Green, 109 Ill. App. 403; Alton Roller Milling Co. v. Bender, 112 Ill. App. 484; Gowen v. Harley, 56 Fed. 973; Bodwell v. Nashua Mfg. Co., 70 N. H. 390; Lewis v. N. Y.

& N. Eng. R. R. Co., 153 Mass. 73; Cantwell v. John
Brennan & Co., 125 Mich. 349.

In Illinois Steel Co. v. Mann, 197 Ill. 186, s. c. 100
Ill. App. 367, it appears from the report of the case
in this court, that the plaintiff complained to Smith,
his foreman, of the plates which made the floor of
the room in which he worked, not because he feared
danger to himself, but because he thought he could do
his work better if the floor was level. He testified
that he saw, "no danger in working on those plates;"
that when he made the complaint and the defendant
did not fix the plates he did not quit work because:
"It was not bad enough to make anybody believe
they would get hurt on it. * * * Q. And
you did not think there was any danger connected
with working on that thing? A. I did not think
of any danger." * * * "I could not see any
danger on it." * * * "Q. Then the complaint
you made to Smith was because it made it dif-
ficult for you to get an ingot up to the furnace
and not because you thought it was dangerous?
A. Not because it was dangerous for me." *
* * "Q. You wanted it level so you could do
your work better? A. Yes, sir. Q. You did not
tell him that you wanted it level so as to make it safe
for you, did you? A. I wanted it so that I could
work on it. I always told him that I wanted it fixed
so that I could put the buggy up there and make it
safe to stand on. I would not say any immediate dan-
ger, of course not. I could do my work better on a
level." While in his answer last quoted plaintiff did
say that he told his foreman that he wanted the floor
fixed so as to "make it safe to stand on," it clearly
appears from his testimony that his complaint was
not made because of any fear of danger to himself.
A judgment in favor of the plaintiff was affirmed in
this court and in the Supreme Court. In the opinion
of the Supreme Court it was said, p. 187:

"Whether the plaintiff's complaint and the promise of the foreman had reference to a threatened danger to plaintiff from the condition of the floor, or only to make it better fit for use in doing the work and running the buggies which carried the ingots over it, or both, as well as whether the time between the alleged promise and the plaintiff's injury was more than was reasonably necessary to enable the defendant to fix the floor, in view of all the circumstances and opportunities for doing such work, involved a consideration and weighing of all the testimony, and we think the court was right in submitting such questions to the jury."

Upon the authority of that case we hold that in this case, whether plaintiff's complaint of the bent screw and the promise of the foreman, after he had straightened that screw, to give her another chuck with another screw, had reference to a threatened danger to plaintiff from the use of the bent and of the straightened screw, or only to make the winding machine better fit for winding wire, or both, as well as whether the time between the alleged promise and plaintiff's injury was more than was reasonably necessary to enable defendant to furnish a chuck with another screw were, under the evidence, questions properly submitted to the jury.

Appellant further contends that the evidence was not sufficient to warrant the court in submitting the case to the jury under either count of the declaration.

In C. & E. I. R. R. Co. v. Heerey, 203 Ill. 492, it was said, p. 499: "In Goldie v. Werner, 151 Ill. 551, it was held that the burden of proof was upon the servant to establish the three propositions, that the appliance was defective, that the master had notice thereof, or knowledge, or ought to have had, and that the servant did not know of the defect and had not equal means of knowing with the master. The third proposition, of course, relates only to patent defects,

and does not embrace the duty of inspection to discover latent dangers and defects.''

The fact that the screw bent, we think, warranted an inference that it was defective, was not of sufficient strength to do the work it was intended and required to do; the act of the foreman in straightening the screw by forcing it back into its proper position did not tend to straighten but to weaken the screw; the outer end of the spool was not supported; it is a matter of common knowledge that in winding a cord upon a spool the cord must be held taut in order to properly wind the cord upon the spool, and the screw broke only fifteen minutes after it was straightened. We cannot say that from this evidence the jury might not properly find, as a fact, that the winding machine at the time of plaintiff's injury was defective and not reasonably safe.

The foreman, the representative of the defendant, knew that the screw had been bent in its use, he straightened the screw and gave the chuck with the straightened screw in it to the plaintiff, with a promise to give her another chuck, and from these facts, we think, the jury might properly find that the defendant had notice, or knowledge, or ought to have had, that the chuck with the straightened screw in it was defective.

As to the third proposition, that the burden was upon the plaintiff to prove that she did not know the defect and had not equal means of knowing with the defendant, it is to be said, first, that the defect was latent and the law did not impose upon her the duty of inspection to discover latent defects, and second, that she had not equal means with her foreman of knowing that the screw, after it was straightened, was defective. The foreman straightened the screw, he knew and she did not know what degree of force was required to straighten the screw, and such knowledge gave him means of judging of the effect of the application of force to the screw, upon the screw

and the metal of which it was made, which the plaintiff did not have.

We think that upon the evidence in this record the court did not err in submitting the case to the jury.

The defendant offered no evidence except as to the nature and extent of plaintiff's injury.  No witness testified directly to the length or diameter of the screw which broke or the material of which it was composed. A bronze chuck with a projecting screw was shown to the plaintiff and she testified in relation thereto as follows:  "Q.  Look at that chuck and see if it looks anything like one of those chucks.  A.  Yes.  Q. Was that similar to the one you used?  A.  Yes, similar, not just like it.  This screw is thicker than the one I used;  *  *  *  otherwise it is the same." Said chuck was then put in evidence and is attached to the transcript of the record.  Plaintiff further testified that the screw which broke was longer than the screw in the chuck shown her.

Emma Mosset first testified that the screw that broke was made of brass; later she stated that she meant that the chuck was made of brass, and said: "I don't really know what the screw is, but I consider the top of the chuck brass."  She was asked to describe the appearance of the screw in the other chuck and said:  "I can't know what the color was— same color as that as far as color is concerned."

Anna Ahrens testified in chief that she looked at the chuck after the screw broke and was asked to describe the screw and answered, "I don't know anything about the screw."  She was asked "What was the screw made of?" and answered, "I don't know." She did finally, in answer to a leading question, say that she believed that the end of the broken screw that she saw in the other chuck resembled the screw in the chuck shown her.  Upon this testimony alone the court, over the objection of the defendant, permitted August Neubert to testify for the plaintiff that the screw in evidence was made of wrought iron.

The witness was then asked what would be the effect of bending the screw in evidence—not the screw which broke—and answered, "that it gets brittle and would stand no resistance." He was then asked: "If a spool should be screwed onto that screw that you have in your hand, after having been bent,.and the screw was then called upon to revolve or made to revolve and a load was carried on the spool, what would be the tendency of that screw?" and answered over the objection of defendant, "It would break."

This evidence was manifestly improper. All that had been shown was that the screw which broke resembled or was similar to the screw in evidence. A steel screw resembles and is similar in appearance to an iron screw; a hand-cut screw made of iron or steel of good quality and high breaking strength is similar in appearance and resembles a machine-made screw made of iron or steel of poor quality and low breaking strength.

The evidence that the screw in evidence was made of wrought iron was not competent to prove that the screw which broke was made of wrought iron. In the absence of proof that the screw in evidence and the screw that broke were made of the same material, of the same quality, were of the same size, it was not proper to give opinion testimony as to the effect of bending the screw in evidence.

The hypothetical question was objectionable, not only because it related to the screw in evidence and not to the screw that broke, but because it assumed, as the basis of the opinion asked for, facts which there was no evidence tending to prove and other facts the details of which were not stated.

It assumed that the screw was to be used while bent, while the evidence shows that it was straightened before it was used; it included the question of load without stating what was the load which it was assumed the spool would carry; it gave no intimation to

the witness as to the extent or the angle to which it was assumed the screw was bent, and for all that appears the witness may have given his opinion upon the assumption that the screw was bent to a right or even greater angle when in fact it may have been only slightly bent; it assumed that the spool was to be revolved without stating whether it was to be revolved rapidly or slowly.

A surgeon called by the plaintiff was permitted to testify, over the objection of defendant, that if an inflammation should be set up in plaintiff's uninjured eye, "the chances are she might lose it." There was no evidence tending to show that there was any reasonable ground to believe or suppose that an inflammation in her uninjured eye would be set up at some time in the future because plaintiff had, three years before the trial, received the injury in question, and testimony as to the possible effects of such inflammation, if from any cause it should occur, was, we think, improper.

The trial judge regarded the damages awarded as excessive and compelled a *remittitur* of $4,000. As thus reduced the damages appear to us, in view of the nature of plaintiff's injury, large, and while we might not reverse the judgment for that cause alone, in view of the errors in the admission of testimony, both that bearing upon the question of liability, and that bearing upon the question of damages, we think the judgment should be reversed and the cause remanded.

*Reversed and remanded.*